UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE L. VARGAS,<br>            Plaintiff,<br><br>     v.<br><br>GUNDERSON RAIL SERVICE,<br><br>            Defendant.<br>_____ | ) 1:04-CV-5365-SMS<br>)<br>) ORDER DENYING DEFENDANT'S REQUEST<br>) FOR JUDICIAL NOTICE (DOC. 23)<br>)<br>) ORDER GRANTING DEFENDANT'S MOTION<br>) FOR SUMMARY JUDGMENT (DOC. 21)<br>)<br>) ORDER DIRECTING THE CLERK TO<br>) ENTER JUDGMENT IN FAVOR OF<br>) DEFENDANT GUNDERSON RAIL SERVICE<br>  AND AGAINST PLAINTIFF JOSE L.<br>  VARGAS |

     The motion of Defendant Gunderson Rail Service came on regularly for hearing on April 29, 2005, at 9:40 a.m. in Courtroom 4 before the Honorable Sandra M. Snyder, United States Magistrate Judge. James M. Shore and Terry Brisco of Stoel Rives LLP appeared on behalf of Defendant; Plaintiff appeared personally. After argument the matter was submitted to the Court.

     I. Background

     On March 1, 2004, Plaintiff Jose L. Vargas, who proceeds pro se and in forma pauperis, filed an unverified employment

discrimination complaint pursuant to Title VII of the Civil
Rights Act of 1964, alleging that on or about February 24, 2003,
Defendant Gunderson Rail Service terminated him, failed to
promote him, and suspended him for two weeks, and that such
conduct was discriminatory because based on race or color and
national origin. Plaintiff alleged that he was not treated
equally as the Caucasian workers when he was told by Mitch Elliot
not to be talking and to keep working. When he returned to work
after a suspension, he was told that he was not employed any
more.

    Plaintiff alleged that he filed charges with the Federal
Equal Employment Opportunity Commission (EEOC) or the California
Department of Fair Employment and Housing regarding the
discriminatory conduct on or about April 1, 2003. On or about
December 4, 2003, Plaintiff received a notice of right to sue
letter that issued from the EEOC. Plaintiff seeks unspecified
damages and injunctive relief as well as costs and attorney's
fees. The EEOC letter attached to the complaint is dated December
2, 2003, and it indicates that with respect to EEOC charge number
375-2003-00088, the EEOC was closing its file because based on
its investigation, the EEOC was unable to conclude that the
information obtained established violations of the statutes; no
finding was made as to any other issues that might be construed
as having been raised by the charge.

    Defendant filed an answer on May 20, 2004, admitting that
Plaintiff was last employed on February 24, 2003, with wages of
$2,200.00 per month; that Plaintiff made a mistake in flagging in
the track, was suspended, and ultimately terminated; and that

Plaintiff filed a charge with the EEOC on May 2, 2003,
complaining that his termination was discriminatory, and received
a right-to-sue letter. Defendant denied that any other claim of
discrimination was raised by Plaintiff. Defendant denied that its
actions were discriminatory or unlawful in any way. Defendant
raised affirmative defenses, including legitimate,
nondiscriminatory reasons for each employment decision; that
anything besides Plaintiff's termination was beyond the scope of
the charge and thus administrative remedies had not been
exhausted; and that claims regarding conduct unrelated to
Plaintiff's termination were barred by the the statute of
limitations. Defendant prayed that the complaint be dismissed
with prejudice and sought attorney's fees and costs.

On March 24, 2005, Defendant filed a motion for summary
judgment; memorandum in support thereof; statement of undisputed
facts (which also contained a request for judicial notice);
declarations of Gordon Prich, Mitchell Elliott, Valerie Prich,
and James Shore; and proof of service. A supplement, consisting
of a printed, reported case, was filed on March 25, 2005.

The Court's informational order to Plaintiff issued on March
28, 2005.

On April 15, 2005, Plaintiff filed a transcript of his
deposition taken on February 11, 2005; and a response to the
motion, in which Plaintiff stated that he moved "for motion of
claim to continue"; indicated that the deposition requested by
Defendant's counsel, James M. Shore on February 11, 2005,
disagreed with declarations of Defendant's statements; and stated
that he enclosed a copy of the deposition. No grounds or good

cause for a continuance were stated by Plaintiff. No proof of service was filed by Plaintiff.

On April 20, 2005, Defendant filed a reply which did not raise any objection to the apparent failure of Plaintiff to file a proof of service of his response to the motion.

II. <u>Jurisdiction and Venue</u>

A district court has jurisdiction of actions brought pursuant to 42 U.S.C. § 2000e-5, and such actions may be brought in any judicial district in the state in which the unlawful employment practice is alleged to have been committed. 42 U.S.C. § 2000e-5(f)(3).

III. <u>Summary Judgment</u>

A. <u>General Standards</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of
> informing the district court of the basis for
> its motion, and identifying those portions of
> "the pleadings, depositions, answers to
> interrogatories, and admissions on file,
> together with the affidavits, if any," which
> it believes demonstrate the absence of a
> genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It is the moving party's burden to establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>British Airways Board v. Boeing Co.</u>, 585 F.2d 946, 951 (9th Cir. 1978).

4

1    However, "where the nonmoving party will bear the burden of

2    proof at trial on a dispositive issue, a summary judgment motion

3    may properly be made in reliance solely on the pleadings,

4    depositions, answers to interrogatories, and admissions on file."

5    Celotex Corp. v. Catrett, 477 U.S. 317, 323. Indeed, summary

6    judgment should be entered, after adequate time for discovery and

7    upon motion, against a party who fails to make a showing

8    sufficient to establish the existence of an element essential to

9    that party's case, and on which that party will bear the burden

10   of proof at trial. Id. "[A] complete failure of proof concerning

11   an essential element of the nonmoving party's case necessarily

12   renders all other facts immaterial." Id. In such a circumstance,

13   summary judgment should be granted, "so long as whatever is

14   before the district court demonstrates that the standard for

15   entry of summary judgment, as set forth in Rule 56(c), is

16   satisfied." Id. at 323.

17   If the moving party meets its initial responsibility, the

18   burden then shifts to the opposing party to establish that a

19   genuine issue as to any material fact actually does exist.

20   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

21   586 (1986). In attempting to establish the existence of this

22   factual dispute, the opposing party may not rely upon the denials

23   of its pleadings, but is required to tender evidence of specific

24   facts in the form of affidavits or admissible discovery material

25   in support of its contention that the dispute exists. Rule 56(e);

26   Matsushita, 475 U.S. at 586 n.11. The opposing party must

27   demonstrate that the fact in contention is material, i.e., a fact

28   that might affect the outcome of the suit under the governing

5

law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, it is the opposing party's obligation to produce a factual predicate from which an inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Although the Court must not weigh the evidence, the Court must draw reasonable inferences; evidence that is too insubstantial or speculative may be insufficient to establish the existence of a genuine issue of

material fact. <u>Coca-Cola Co. v. Overland, Inc.</u>, 692 F.2d 1250, 1255 (9th Cir. 1982) (holding alternatively that in the face of a presumption that "Coke" was a trademark that was not generic, employees' affidavits that they believed that customers used "Coke" in a generic sense were too speculative and insubstantial to establish the existence of a material fact regarding whether "Coke" was generic, and citing <u>British Airways Board v. Boeing Co.</u>, 585 F.2d 946, 951-52 (9th Cir. 1978) (holding that where the moving party had presented evidence that a crack in a part was unrelated to the cause of an airplane crash, no evidence that would permit an inference giving rise to a genuine issue of material fact was presented where the opposing party submitted evidence that a crack could lead to a catastrophic accident and a conclusion by an investigating agency that it could not be determined if the part of the airplane affected by the crack had been the first portion of the plane to disintegrate)); <u>Dept. of Commerce v. U.S. House of Rep.</u>, 525 U.S. 316, 334 (1999) (holding that experts' generalized assertions about the insufficiency of an opposing expert's methodology were insufficient to create a genuine issue of material fact). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. <u>Anderson</u>, 477 U.S. at 251-52. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. <u>Id.</u> at 587.

The showings must consist of admissible evidence, Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980), or pleadings, depositions, answers to interrogatories, admissions, and affidavits or declarations, Fed. R. Civ. P. 56(c). Affidavits shall be based on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e). Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. Id. Declarations pursuant to 28 U.S.C. § 1746 may be used with the same force and effect as affidavits. Pollock v. Pollock, 154 F.3d 601, 611, n.20 (6th Cir. 1998). A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence. Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000). Personal knowledge may be inferred from declarations themselves, such as from facts concerning a declarant's position and participation, Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990); however, a court cannot draw an inference about facts not specifically put in the record by a party, and a court will not assume that general averments embrace specific facts needed to sustain a complaint, Lujan v. National Wildlife Federation, 497 U.S. 871, 887 (1990). An admission in a pleading, including a defendant's failure to deny an allegation in a complaint, constitutes an admission. Fed. R. Civ. P. 8(d); Lockwood v Wolf. Corp., 629 F.2d 603, 611 (9th Cir. 1980). Unauthenticated

documents cannot be considered on a motion for summary judgment. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1990). Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

The Court is not obligated to consider matters that are in the record but are not specifically brought to its attention; the parties must designate and refer to specific triable facts. Even in the absence of a local rule, for evidence to be considered, the party seeking to rely on it must specify the fact by indicating what the evidence is or says and must indicate where it is located in the file. Although the Court has discretion in appropriate circumstances to consider other material, it has no duty to search the record for evidence establishing a material fact. Carmen v. San Francisco United School Dist., 237 F.3d 1026, 1029 (9th Cir. 2001).

A party moving for summary judgment is entitled to the benefit of any relevant presumptions that support the motion provided that the facts giving rise to the presumption are undisputed. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1254 (9th Cir. 1982).

> B. Plaintiff's Failure to Respond to Statement of
>    Undisputed Facts

Plaintiff failed to comply with the underlined portions of Local rule 56-260(b), which provides:

> Any party opposing a motion for summary judgment or
> summary adjudication shall reproduce the itemized facts
> in the Statement of Undisputed Facts and admit those facts
> which are undisputed and deny those which are disputed,

9

including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relied upon in support of that denial. The opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication. The opposing party shall be responsible for the filing with the Court of all evidentiary documents cited in the opposing papers. If a need for discovery is asserted as a basis for denial of the motion, the party opposing the motion shall provide a specification of the particular facts on which discovery is to be had or the issues on which discovery is necessary.

Here, Plaintiff failed to respond systematically to Defendant's statement of undisputed facts, and Plaintiff has not filed a statement of disputed facts. Plaintiff has failed to comply with Local Rule 56-260(b) or to establish any justification for failing to do so.

However, Defendant did not specifically object to Plaintiff's failure in this regard; indeed, at the hearing on the motion, Defendant expressly concurred in the Court's decision to consider the motion on the merits. Defendant did argue that it was entitled to summary judgment because Plaintiff could not merely rest on the allegations of his pleading but had to set forth specific facts showing that there was a genuine issue for trial, and that summary judgment should be entered against Plaintiff if appropriate. The written materials submitted by Plaintiff consist of one deposition of 118 pages.

In light of Defendant's concurrence, and in the exercise of its broad discretion to interpret and apply its local rules and its inherent power to control its docket and the disposition of its cases with economy of time and effort for both the court and the parties, the Court will review the evidentiary material

timely submitted by both parties to determine the presence or absence of an issue of fact.

C. <u>No Continuance</u>

In his response to the motion, Plaintiff stated:

Plaintiff, Jose Luis Vargas, Hereby move for motion of claim to continue....

Plaintiff's response did not include an affidavit. It bore the title of a response; it was not designated or filed as a motion. Plaintiff did not state any grounds for a postponement or continuance. Instead, Plaintiff asserted that he was not treated equally, and he filed the transcript of his deposition as support for his disagreement with the declarations submitted by Defendant. He did not allude to any need for further discovery or preparation of responsive materials.

At the hearing, Plaintiff did not pursue the subject of a continuance or state any grounds relating to a continuance.

Fed. R. Civ. P. 56(f) provides as follows:

(f) When Affidavits are Unavailable.  Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The Ninth Circuit has explained that in order to prevail on a Rule 56(f) motion, the party "must show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." <u>State of California v. Campbell</u>, 138 F.3d 772, 779 (9th Cir. 1998).  "In making a Rule 56(f)

1   motion, a party opposing summary judgment 'must make clear what

2   information is sought and how it would preclude summary

3   judgment.'" Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998)

4   (quoting Garrett v. City and County of San Francisco, 818 F.2d

5   1515, 1518 (9th Cir. 1987)). The burden is on the party seeking

6   to conduct additional discovery to put forth sufficient facts to

7   show that the evidence sought exists. Volk v. D. A. Davidson &

8   Co., 816 F.2d 1406, 1416 (9th Cir. 1987).

9       In the present case, Plaintiff did not request an extension

10  of time to conduct discovery so as to oppose the motion for

11  summary judgment. He did not submit the required affidavit.

12  Further, Plaintiff has not identified any specific facts he seeks

13  to elicit from any further discovery. The Court finds his

14  statement about a motion to continue to be insufficient to

15  constitute or to support a motion pursuant to Rule 56(f).

16      IV. Failure to Exhaust Administrative Remedies

17      Defendant argues that Plaintiff failed to exhaust his

18  administrative remedy with the EEOC for any claims stated in his

19  complaint other than his discharge,[1] including Defendant's

20  promotion decisions, pay practices, or different treatment of

21  Plaintiff because of his national origin.

22  //

23  //

24  //

25  //

26  //

27  _____

28          [1] The Court understands that Plaintiff's claim regarding his discharge includes the suspension that
        immediately preceded, and constituted part and parcel of, his discharge

//

## A. Defendant's Undisputed Facts

In pertinent part, Defendant's statement of undisputed facts states the following:

| | |
|---|---|
| Vargas filed a charge with the EEOC, claiming race and national origin discrimination in his termination. | V. Prich Decl. ¶ 20; Exh. E; Vargas Dep. Tr. 78:14 - 79:4. |
| Vargas indicated the "date discrimination took place" was 2/10/2003 to 2/24/2003, and did not check the box indicating, "continuing action." | V. Prich Decl. ¶ 20; Exh. E; Vargas Dep. Tr. 78:14 - 79:4. |
| Vargas did not raise the issue of discrimination in promotion, pay practices, or unequal treatment by Elliott in his EEOC charge. | V. Prich Decl. ¶ 20; Exh. E; Vargas Dep. Tr. 78:14 - 79:4, 79:21 - 80:18, 87:8 - 13. |
| The EEOC dismissed the charge, unable to conclude that the evidence it obtained established a violation of Title VII. | Shore Decl. ¶ 5; Exh. B. |
| Vargas filed suit, adding new claims that were not presented to the EEOC. Vargas's lawsuit goes beyond the scope of his EEOC charge and alleges discrimination in Gunderson's failure to promote him, failure to increase his pay, and unequal treatment by his supervisor. | Complaint; Vargas Dep. Tr. 87:8 - 13. |

## B. Additional Facts

Reference to the charge that Plaintiff filed with the EEOC (Decl. of Valerie Prich, Ex. E) confirms Defendant's statement of undisputed facts, except that the only cause of discrimination

13

identified by Plaintiff in the charge was national origin (Mexican); race was not mentioned. The only action of Defendant mentioned was Plaintiff's suspension on February 10, 2003, for two weeks, and his discharge upon return for inefficient performance of duties.[2] Plaintiff admitted that it was his signature that appeared on the charge. (Pltf.'s Dep. at 80.) Although Plaintiff claimed that in an application he put everything, he admitted that the charge itself did not contain anything regarding conversations, how he was paid, promoted, spoken to, or otherwise treated by Defendant or its agents (Id. at 79-80, 86-87.) Plaintiff did not provide any documentation of his claim that he submitted any additional information to the EEOC beyond what appeared in the charge.

C.  Analysis

Generally, before filing suit on a statutory employment discrimination claim, the aggrieved employee must have exhausted the employee's administrative remedy by filing a timely and sufficient charge with the appropriate administrative agency and obtained a "right to sue" letter. 42 U.S.C. § 2000e-5(b), (f)(3). A failure of exhaustion in the form of a failure to file a timely administrative claim has been characterized as not jurisdictional and may be raised as an affirmative defense to the claim. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982). However, the filing of a sufficient administrative claim that includes the matters forming the basis of a later judicial claim, and the

---

[2] Although the charge indicates that Plaintiff was discharged on December 6, 2002, Plaintiff testified at deposition that this date was incorrect, and that the date of discharge was February 24, 2003. (Pltf.'s Dep. at 79-80.) This is undisputed.

receipt of a right-to-sue letter, have been referred to as jurisdictional pre-requisites to maintaining a Title VII action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973) (filing charges with the EEOC and receiving notice of the right to sue are jurisdictional prerequisites to filing a suit in federal court); B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1099 (9th Cir. 2002). The purpose of the requirement of administrative exhaustion is to give the charged party notice of the claim and to permit investigation and conciliation by the administrative agency, as well as to narrow the issues for prompt adjudication and decision. Id. A judicial complaint may encompass any discrimination like or reasonably related to the allegations of the EEOC charge. Freeman v. Oakland Unified School District, 291 F.3d 632, 636 (9th Cir. 2002) (quoting Oubichon v. North Am. Rockwell Corp., 482 F.2d 569, 571 (9th Cir. 1973)). A district court's jurisdiction extends to all allegations of discrimination that either fell within the scope of the EEOC's actual investigation or an EEOC investigation that can reasonably be expected to grow out of the charge of discrimination. Freeman, 291 F.3d at 636. A district court must inquire whether the original EEOC investigation would have encompassed the additional charges made in the court complaint but not included in the EEOC charge itself. Id. The language of EEOC charges must be liberally construed because the charges are often made by lay people who are not expert in the technicalities of formal pleading; the crucial element of the charge is the factual statement. B.K.B. 276 F.3d at 1100. Allegations of discrimination not included in the administrative charge may not be considered by a district

court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge. Id. Factors appropriately considered are the alleged basis of the discrimination, dates of the discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, locations at which discrimination is alleged to have occurred, and the extent to which the judicial claims are consistent with the Plaintiff's original theory of the case. Id.

Here, the charge itself set forth facts solely regarding Plaintiff's two-week suspension and termination that occurred within a two-week period between February 10 and 24, 2003 for allegedly inefficient performance of duties; Plaintiff stated that he was aware of Anglo coworkers who had also been inefficient in the performance of their duties but they had not been terminated, and he believed that he was discharged because of his national origin. (V. Prich Decl., Ex. E.) The period of time within which Anglo coworkers had allegedly been inefficient but not terminated is not expressly set forth in the charge, but the disparate treatment alluded to is reasonably interpreted as being contemporaneous with Plaintiff's discharge in light of the dates stated in the charge, namely, February 10, 2003 through February 24, 2003. The person or entities responsible are reasonably understood as those responsible for Plaintiff's discharge. Although the facts allude to disparate treatment of coworkers, the only facts stated relate to inefficiency and termination or failure to terminate for inefficiency. The claim is thus not a broad allegation of systematic or long-term disparate treatment in other aspects of employment; rather, it

16

refers to focused, discrete phenomena of the employer's
suspension and discharge. Further, because the discharge and
suspension are the only events noted in the charge, this charge
is distinguished from charges of sustained, serial acts of
harassment, hostility, or unequal treatment.

The additional claims that Plaintiff seeks to have
adjudicated in this action include failure to promote and/or give
pay raises to Plaintiff, and Plaintiff's being told by Mitchell
Elliott not to be talking and to keep working. A discriminatory
failure to promote or to give pay raises to Plaintiff is not
reasonably related to the claim of discharge. See Ong v. Cleland,
642 F.2d 316, 319-20 (9th Cir. 1981) (holding that where the
administrative claim alleged a discriminatory denial of
promotion, administrative remedies with respect to a claim of a
later constructive discharge were not exhausted where there was
no administrative allegation of a pattern or practice of
discrimination); Albano v. Schering-Plough Corp., 912 F.2d 384,
386-7 (9th Cir. 1990). There is no apparent factual overlap of
the circumstances surrounding the suspension and termination and
those relating to any failure to promote or give raises. The
claim relating to Elliott's telling Plaintiff not to be talking
instead of working arguably concerns inefficiency in work, which
was one factor in Plaintiff's termination.[3] However, Plaintiff's

_____

[3] Plaintiff testified that Mitchell Elliott would supervise him by yelling to him, especially when he was
working with Jose Garcia, to finish the work. Plaintiff's one-year performance appraisal given to him by Elliott on or
about January 18, 2002, indicated that Plaintiff should focus more on the job at hand, keep busy, and not stand
around so much, as well as improve his attendance. (Id. at 49-50.) Plaintiff testified that on January 6 or 7, 2003,
Elliott suspended Plaintiff for one day for careless or inefficient performance of duties, resulting in a waste of time
for spending too much time, most of a day, on a job. (Dep. at 62.) G. Prich's declaration, in contrast, states that it
was Prich who decided to suspend Plaintiff for inefficient performance of his duties for one day in early January
2003. (Decl. at 7.) Plaintiff testified that the portion of his complaint that referred to unequal treatment of Mexican

complaint regarding his treatment by Elliott relates to a long-term pattern or practice of discriminatory treatment, harassment, or hostile work environment, and not to his suspension and termination. There is no evidence that the EEOC's investigation included investigation of how Elliott talked to Plaintiff on the job. There is no basis for a conclusion that a reasonable investigation of a claim of discriminatory suspension and discharge would include investigation of such varied activities as promotions or raises. Although an investigation of the discharge would have included examination of the basis for the discharge, and most directly the motivation of Prich in suspending and discharging Plaintiff, it is not reasonable to conclude that it would have included investigation of how Elliott, who did not decide to terminate Plaintiff, spoke to Plaintiff on the job or other such aspects of Plaintiff's work environment. Instead, the EEOC investigation would have focused on the reasons for the discharge of Plaintiff. The claims are not so related that a reasonable investigation of Plaintiff's suspension and discharge for safety violations, insubordination, and inefficiency would extend to previous promotions, raises, or how Elliott interacted with Plaintiff at the job site. See Aramburu v. The Boeing Co., 112 F.3d 1398, 1409-10 (10th Cir. 1997) (holding that where the administrative charge was for

---

and Causasian workers referred to a time that Elliott would tell him and Garcia to stop talking and keep working, whereas other employees, including Keller, Staley, Guintana, and unidentified others were also talking for long periods but had not been told by Elliott to stop. (Dep. at 85-86.) When asked when that happened, Plaintiff testified that it was a lot of times, pretty often, and most of the time. (Dep. at 85-86.) It was Gordon Prich, however, who suspended Plaintiff for two weeks and ultimately decided to terminate Plaintiff because of insubordination, serious safety violations, and poor work performance. (Prich Decl. at 4, Elliott Decl. at 4.) Both Prich and Elliott declared that Elliott did not have the authority to hire or terminate employees and was not consulted before Plaintiff was suspended and terminated. (Prich Decl. at 4, 8-10; Elliott Decl. at 1,4.)

discriminatory discharge based on Mexican-American ancestry, and it involved allegedly unfair application of attendance policy, Plaintiff did not exhaust his claim of hostile work environment on the basis of Mexican ancestry which related to harassment and being required to work beyond medical restrictions because such claim was not reasonably related to the administrative claim); Tart v. Hill Behan Lumber Co., 31 F.3d 668, 673 (8th Cir. 1994) (holding that filing a charge of discriminatory discharge based on race did not exhaust a claim of racial harassment in the workplace in a case involving state law governed by Title VII standards).

It is true that in some sense Elliott's expectations of Plaintiff's work performance figured in to his evaluations of Plaintiff's performance, which in turn played some part in Prich's decision to terminate Plaintiff. However, the presence of some relatively distant, logical relationship between Elliott's treatment of Plaintiff on the job and Prich's ultimate decision to terminate Plaintiff is something different from, and significantly less than, a reasonable relationship such that Plaintiff's claims of being yelled at to keep working would be included in an EEOC investigation of suspension and discharge for other reasons. To conclude otherwise would do violence to the policies underlying the requirement of exhaustion of administrative remedies.

Accordingly, the Court concludes that the only claim regarding which Plaintiff exhausted his administrative remedies is his claim of discriminatory suspension and discharge.

V. Statute of Limitations

Defendant raised the statute of limitations in its answer. Defendant argues in this motion that Plaintiff's claims regarding discriminatory failure to promote, failure to grant pay raises, and unequal treatment on the job are barred by the statute of limitations.

Title VII actions generally must be preceded by filing of charges with the EEOC within 180 days after the allegedly unlawful employment practices occurred. 42 U.S.C. § 2000e-5(e)(1). However, the 180-day limit does not apply if charges may also be filed initially with a state agency that enforces the state's anti-discrimination laws. Id. In such states, the charge shall be filed within 300 days after the alleged unlawful employment practice occurred. Id. California is a jurisdiction with a fair employment practices agency; thus, the limit of 300 days, and not 180 days, applies. 29 C.F.R. §§ 1601.13(a)(4), 1601.74(a); see Raad v. Fairbanks North Star Borough School District, 323 F.3d 1185, 1192 (9th Cir. 2003) .

Plaintiff's claims regarding discriminatory failure to promote, failure to grant pay raises, and unequal treatment on the job occurred no later than February 24, 2003. There is no evidence that these practices were the subject of charges filed within the 300 days following their occurrence. It is established that claims for discrete acts of discrimination, such as discriminatory treatment or failure to promote or grant raises, are barred if administrative claims are not filed within the required period. National Railroad Passenger Corp. v. Morgan, 536 US. 101, 109-10 (2002). This is the case even if other, similar discriminatory acts occurred within the period. A discriminatory

practice, even though extending over time and involving a series of related acts, remains divisible into a set of discrete acts; thus, legal action on the basis of each act must be brought within the statutory limitations period. Lyons v. England, 307 F.3d 1092, 1108 (9th Cir. 2002).

Accordingly, the Court concludes that claims for these discrete acts of discrimination are barred by the statute of limitations, and Defendant is entitled to judgment as a matter of law.

VI. Discriminatory Suspension and Discharge

A. Undisputed Facts

| | |
|---|---|
| Gunderson produces, refurbishes, repairs and maintains thousands of railcars at facilities in several states, including California. Gunderson's Modesto, California plant conducts freight car repair and cleaning services. | G. Prich Decl. ¶ 5 |
| Most of Gunderson's Modesto employees are welders, and others are car cleaners. There are also lead and assistant lead workers for these two job classifications. | G. Prich Decl. ¶ 7 |
| Approximately 45 percent of Gunderson's Modesto workforce is Hispanic, and two of its five leads and assistant leads, Michael Quintana and Kevin Carlson, are Hispanic. | G. Prich Decl. ¶ 9 |
| Eight percent of the workforce and two of the leads and assistant leads are African American. | G. Prich Decl. ¶ 8-9 |

| | |
|---|---|
| The Plant Manager, Gordon Prich, is a disabled individual. | G. Prich Decl. ¶ 4 |
| Gunderson's workforce was similarly diverse during the period it employed Vargas. | G. Prich Decl. ¶ 8 |
| Vargas is Mexican. | Vargas Dep. Tr. 36:18 – 19 |
| Gordon Prich is solely responsible for hiring, terminating, and setting the pay rates of Gunderson employees in Modesto. Lead employees working under Mr. Prich's management conduct performance reviews and provide day-to-day supervision. | G. Prich Decl. ¶¶ 10, 11, 13, 56 |
| Mr. Prich hired Vargas on June 27, 2001 as a welder. | G. Prich Decl. ¶ 23 |
| The leads generally give employees performance reviews at six months, one year, eighteen months and two years, and then annually thereafter each September. | V. Prich Decl. ¶ 12, 14; G. Prich Decl. ¶¶ 10, 11, 13, 56 |
| Gunderson employees are "at-will" employees, meaning that either the employee or the Company may terminate the employment relationship at any time. | G. Prich Decl. ¶ 10; Vargas Dep. Tr. 22:2 – 23:3 |
| Gunderson compensates its welders from $12.50 to $15.77 per hour. | G. Prich Decl. ¶12 |
| Gunderson's two highest paid welders, Jose Garcia and Jose Ortiz, are Hispanic. | G. Prich Decl. ¶12 |

| | |
|---|---|
| Car cleaners earn $9.57 to $11.65 per hour; Gunderson's highest paid car cleaner, Marco Flores, is also Hispanic. | G. Prich Decl. ¶12 |
| Gunderson's highest paid lead is an African American. | G. Prich Decl. ¶12 |
| In 2003, half the welders at Gunderson were making more than Vargas (six of whom are Hispanic), and half were making less (five of whom are Hispanic). | V. Prich Decl. ¶ 14. |
| Gunderson routinely disciplines, and, where warranted, discharges employees for loafing on the job, violations of company policies and safety rules, absenteeism, insubordination and other performance and conduct problems. | G. Prich Decl. ¶ 16 |
| Only three employees were discharged for insubordination from July 1, 2001 to August 1, 2003 – Vargas, Charles Beard and Scott Christie. Beard and Christie are both Caucasian. | G. Prich Decl. ¶ 17 |
| Since 2002, six other employees were warned about safety violations – three Hispanic and three Caucasian – and thirteen other employees were warned about poor performance – seven Hispanic and six Caucasian. | G. Prich Decl. ¶ 21 |

| | |
|---|---|
| Gunderson has adopted a Harassment Prevention Policy, which prohibits employees from harassing other employees and from creating an offensive working environment. | V. Prich Decl. ¶ 9; Exh. D |
| The policy "is designed to ensure mutual respect among employees" and covers "a broad range of activities" including, but not limited to racial slurs and persistent offensive conduct. | V. Prich Decl. ¶ 9; Exh. D |
| Employees who believe that actions or words of another constitute unwelcome harassment are obligated to report the misconduct immediately to the Human Resources Director or General Counsel. | V. Prich Decl. ¶ 9; Exh. D |
| A copy of this policy is given to all employees when they are hired. | V. Prich Decl. ¶ 10 |
| Vargas received a copy of this policy, and it was reviewed with him when he was hired. | V. Prich Decl. ¶ 11; Exh. D; Vargas Dep. Tr. 38:25 – 39:7 |
| Vargas understood that if he had any problem at work that he thought was harassment or discrimination, he could talk to Gordon Prich or to Human Resources. | Vargas Dep. Tr. 40:6 – 10. |
| The Association of American Railroads (AAR) sets standards for properly gauging the hoses that connect the brakes on railroad cars. | G. Prich Decl. ¶ 29; Exh. C |

| | |
|---|---|
| Gunderson has adopted an operating standard incorporating the AAR standard for hose gauging. | G. Prich Decl. ¶ 30; Exh. D |
| Vargas had received the Company's written policy and formal training on how to properly gauge the hoses that connect railroad car brakes and had watched a video and received hands-on training in the field. | Declaration of Mitchell Elliott ¶ 5; Exh. A; Vargas Dep. Tr. 40:19 – 20, 40:24 – 40:25, 42:1-14 |
| Vargas understood the procedure and the importance of the safety issue involved. | Vargas Dep. Tr. 48:9 – 13 |
| An emergency stop can cause far-reaching delays on the train system; it can even cause the train to derail, damaging tracks and cars, possibly causing the release of hazardous materials and injury or death to employees or bystanders. | G. Prich Decl. ¶ 32 |
| Mr. Prich prepared a written warning on November 1, 2001. | G. Prich Decl. ¶33; Exh. E; Vargas Dep. Tr. 46:22 – 47:16 |
| In May 2002, Vargas was working on a railroad car equipped with a sliding door weighing 1250 pounds. | G. Prich Decl. ¶ 36 |

| | |
|---|---|
| Without the stop in place, a worker can inadvertently push the door off the car onto a co-worker; the uneven motion of the train crossing a roadway intersection also can cause the door to fall onto a vehicle waiting for the train to pass, killing the occupants. | G. Prich Decl. ¶ 36; Elliott Decl. ¶ 9 |
| Gunderson has had rail car doors fall off onto the track in the past. Mr. Prich viewed this as an extremely dangerous situation. | G. Prich Decl. ¶ 36 |
| Vargas understood the danger and had been warned about it once before. | Elliott Decl. ¶ 10; Vargas Dep. Tr. 57:5 – 57:10 |
| Mr. Prich prepared a written warning on May 13, 2002. | G. Prich Decl. ¶ 36; Exh. 10; Vargas Dep. Tr. 56:5 – 8 |
| Mr. Prich prepared a written warning on January 18, 2002 for Vargas' violation of the company absenteeism plan. Plaintiff admittted that Prich talked to him about it and testified that he did improve his attendance and was not tardy again. | Vargas Dep. Tr. 49:3 – 18 |
| Vargas understood he needed to improve his performance and his attendance. | Vargas Dep. Tr. 49:19 – 50:13 |

| | |
|---|---|
| Federal Railroad Administration regulations require workers to switch the live track away from the portion they are working on and place a blue flag on the track to signify to the engineer not to enter the area. | 49 C.F.R. § 218.23; § 218.27; § 218.37 (2004); G. Prich Decl. ¶ 42; Exh. M; Exh. N; Elliott Decl. ¶ 17 |
| Without the blue flag in place and the tracks properly switched away from the working area, a train could enter the area and crush anyone on the tracks. | G. Prich Decl. ¶ 45; Elliott Decl. ¶17 |
| Violation of these federal regulations subjects the Company to a $5,000 fine. | G. Prich Decl. ¶¶ 45, 46; Exh. N; Elliott Decl. ¶17 |
| Mr. Prich learned of on the blue flag the violation from employees of the adjacent business. | G. Prich Decl. ¶ 42, 44, 47; Elliott Decl. ¶ 17 |
| The blue flag violation was extremely serious: forgetting to place the flag or lock the track could result in death. | Vargas Dep. Tr. 43:4- 23; 73:3 – 9 |
| Vargas had watched a video, received hands-on training in the field, and discussed the blue flag procedure in safety meetings. | Vargas Dep. Tr. 43:24 - 44:8; Elliott Decl. ¶ 18 |
| Vargas had acknowledged that he understood the blue flag procedure only a month before failing to follow it. | Elliott Decl. ¶ 18; Exh. D; Vargas Dep. Tr. 44:16 – 24 |
| Mr. Prich suspended Vargas for two weeks without pay. Elliott did not tell Prich about it or talk to him about it. | G. Prich Decl. ¶ 48, 49; Exh. O; Elliott Decl. at 4. |

| | |
|---|---|
| Elliott had talked to Vargas about his slow performance and wasting time several times before his six month review | Elliott Decl. ¶ 8 |
| Mr. Prich had told him he needed to "pick up the pace." | G. Prich Decl. ¶ 34 |
| Vargas' response was that he was doing his best and he would get it done. | Elliott Decl. ¶ 8 |
| Mr. Prich suspended Vargas for one day for "careless or inefficient performance of duties resulting in waste of time." | G. Prich Decl. ¶ 39; Exh. K; Elliot Decl. ¶ 15 |
| Vargas was not alone in earning this disciplinary suspension for inefficient performance of duties. On the same day, Nicolas Duarte, who is Hispanic, and Dieter Schweininger, who is Caucasian, had taken too long on threshold cap replacements. Prich gave both these individuals two days off without pay because they had wasted even more time than Vargas. | G. Prich Decl. ¶ 40; Exh. L |
| Vargas had received and was aware of the Company's attendance policy. | V. Prich Decl. ¶¶ 7, 8; Exh. C; Vargas Dep. Tr. 46:3 – 7 |
| By early 2002, Vargas' unexcused absences put him in violation of the policy at a level of warranting termination. | V. Prich Decl. ¶ 7, Exh. C. |

| | |
|---|---|
| Mr. Prich gave Vargas a written warning on January 18, 2002 for violating the Company's attendance policy. | G. Prich Decl. ¶ 35; Exh. G. |
| At the end of the two-week disciplinary suspension, Vargas missed his first scheduled day back to work on February 21, 2003. | G. Prich Decl. ¶ 51; Vargas Dep. Tr. 74:17 – 21 |
| He called in sick ten minutes before the start of his shift, because he was "stressed" about the two-week suspension and felt "kind of feverish." | V. Prich Decl. ¶ 16; Vargas Dep. Tr. 74:22 - 75:6. |
| Vargas did not bring a doctor's note upon his return to work as required for an excused absence under Gunderson's absenteeism policy. | G. Prich Decl. ¶ 51; V. Prich Decl. ¶ 16; Exh. C |
| When he did show up to work on February 24, Mr. Prich called him into his office to ask him why he had missed work on Friday and to talk to him about his recent suspension and performance issues. | G. Prich Decl. ¶ 52; Vargas Dep. Tr. 75:7 – 25 |
| Vargas told Prich he would be willing to do what he was supposed to be doing in the proper amount of time if he were paid more money, or what he was supposed to be paid. | G. Prich Decl. ¶ 53; Vargas Dep. Tr. 76:20 - 77:2. |
| Mr. Prich terminated Vargas' employment with Gunderson without telling Plaintiff why he was being terminated. | G. Prich Decl. ¶ 53; Vargas Dep. Tr. 77:4 - 8 |

29

| | |
|---|---|
| Prich increased Vargas' compensation three times in the first fifteen months of his employment: on 1/14/02 to $13.00; on 8/19/02 to $13.50; on 9/21/02 to $13.98. | G. Prich Decl. ¶ 26; Vargas Dep. Tr. 54:23 – 56:4 |
| Prich maintains an "open door" policy and encourages employees to talk to him about their concerns. | G. Prich Decl. ¶ 62 |
| Employees also know they can contact Human Resources at Gunderson's corporate headquarters. | G. Prich Decl. ¶ 63 |
| Vargas never complained about any "unequal treatment" – by Elliott or anyone else at Gunderson – to Prich or to Human Resources. | Vargas Dep. Tr. 36:10 – 15; 40:13 – 18; 60:14 – 25; 62:3 – 14 |
| While Vargas had told Prich he wanted a pay raise on several occasions, he never complained about Elliott. | G. Prich Decl. ¶¶ 59, 60 |

B. Disputed Facts

1. Hose Gauging

Defendant's Evidence

| | |
|---|---|
| On November 1, 2001, Mr. Prich discovered that Vargas had failed properly to gauge the hoses, creating the risk that the hoses could become separated while the train was moving, causing the train to come to an "emergency stop." | G. Prich Decl. ¶ 31; Elliott Decl. ¶¶ 6, 7; G. Prich Decl. ¶33 |

/

//

30

1      <u>Plaintiff's Evidence</u>

2      Plaintiff testified that despite his training, he lacked

3  experience with hose gauging, and the rules had recently changed;

4  Jose Garcia was really the one who had performed the task of

5  gauging the hose. (Dep. at 48-49.)

6                    2. <u>Inefficient Performance of Duties</u>

7      <u>Defendant's Evidence</u>

8  Vargas took seven and one          G. Prich Decl. ¶33
   half hours to gauge the
9  hoses. Mr. Prich believed the
   job should take one and one
10 half hours.

11

12 In Vargas' January 2002            Elliott Decl. ¶ 8, Exh. B
   performance evaluation,
13 Elliott stated he "need[ed]
   to focus more on the job at
14 hand.  Keep busy.  Too much
   standing around."
15

16 On January 6, 2003, Elliott        Elliott Decl. ¶ 12
   observed Vargas loafing
17 around, walking up and down
   the track, talking to other
18 workers and not getting his
   job done.
19

20 Elliott believed Vargas was        Elliott Decl. ¶ 12
   disrupting the work of other
21 employees.

22
   Elliott and Danny Rose,           Elliott Decl. ¶ 12, 13; Vargas
23 another lead, had talked to        Dep. Tr. 68:17 - 69:13
   Vargas previously and told
24 him that if he didn't stop
   wasting time, he would be
25 written up.

26

27

28

                              31

| | |
|---|---|
| Mr. Prich, ascertained that Vargas had taken 23 1/2 hours to replace the "bell mouth" on a car. | G. Prich Decl. ¶ 38; Elliott Decl. ¶ 14; Exh. C; Vargas Dep. Tr. 66:9 - 67:12 |
| Mr. Prich believed the job should have taken no more than 16 hours. | G. Prich Decl. ¶ 38 |
| On February 8, 2003, a Saturday, it took Vargas five or five and one-half hours to put a "strato kit" on a Sante Fe car while he was being paid time-and-one-half. Elliott had seen Vargas install a strato kit on a car in one and one half hours. | G. Prich Decl. ¶ 41; Elliot Decl. ¶ 16 |

   Plaintiff's Evidence

   Plaintiff testified that after four months of employment, he asked for a raise, and after that, Elliott looked for "things to get [him]." Plaintiff was busy all the time, although he had no witnesses to any incidents other than Elliott and the lead man. Nevertheless, Plaintiff never did anything to dispute his evaluations. Plaintiff maintained that he performed his jobs faster than most. (Dep. at 50-51.) Everyone else was given more time, at least two and one-half hours, and Plaintiff was faster than the others. (Dep. at 62-65.) With respect to February 8, 2003, Plaintiff said he installed a hose on a car, was given one-half hour only to do it, and the others were given longer. (Dep. at 68-69.)

/

//

3. <u>Failure to Place a Stop at the Sliding Door</u>

<u>Defendant's Evidence</u>

| | |
|---|---|
| Elliott had instructed Vargas to install a stop on the side of the car to prevent the door from sliding off the train onto the track, but Vargas failed to do so. | G. Prich Decl. ¶ 36; Elliott Decl. ¶ 9 |

<u>Plaintiff's Evidence</u>

Plaintiff testified that Plaintiff instructed another worker, whose identity Plaintiff could not recall, to put the stop on, but the person failed to do it. Plaintiff testified that the other workers never minded him or listened to him; Plaintiff was not sure if the other person was written up for the violation. Plaintiff admitted that Plaintiff did not tell Prich or Elliott that Plaintiff's being disciplined for it was unfair. Further, Plaintiff worked to improve his performance. (Dep. at 58-59.)

4. <u>Unmarked Coupler</u>

<u>Defendant's Evidence</u>

| | |
|---|---|
| When railroad workers remove parts from a car, they are required by American Association of Railroad (AAR) rules to mark the parts to prevent them from being re-used or disposed of improperly. | G. Prich Decl. ¶ 37; Exh. I |
| Violation of the rule can result in a fine or penalty, and can result Gunderson having to repay customers for work that was improperly performed. | G. Prich Decl. ¶ 37; Exh. I |

| | |
|---|---|
| Vargas understood the safety and customer service implications of violating the rule. | Vargas Dep. Tr. 59:5 – 60:16 |
| In November 2002, Elliott saw an unmarked coupler on the ground near where Vargas was working. | Elliott Decl. ¶ 11 |
| Elliott prepared a verbal warning on November 15, 2002. | Elliott Decl. ¶ 11; G. Prich Decl. ¶ 37; Exh. J |

Plaintiff's Evidence

Although Plaintiff did not dispute that he was warned with respect to an unmarked coupler, he testified that he had tried to obtain from Kevin, another worker, the right number to mark on the coupler, but Kevin did not respond; thus, it was not Plaintiff's fault. David Petty had said that Plaintiff should not be disciplined, but Mitch Elliott said it was not Kevin's mistake, and Elliott wrote a warning. Despite Plaintiff's belief that he was wrongly disciplined for this, he never complained to David or anyone. (Dep. at 59-62, 65.)

5. Blue Flag Violation

Defendant's Evidence

| | |
|---|---|
| On February 8, 2003, Vargas failed to align the track properly and lock it in place as required by the blue flag regulations. | G. Prich Decl. ¶ 42, 44 |

Plaintiff's Evidence

Plaintiff testified that he alone worked on this task, but it was his first time doing the job. He admitted that he made a

34

1 mistake by not putting a blue box to cover the lock, but the flag

2 was up. He further admitted that a blue flag violation is a

3 safety concern. (Dep. at 72-73.)

4          C. <u>Analysis</u>

5     A plaintiff in a suit for discriminatory treatment pursuant

6 to Title VII of the Civil Rights Act of 1964 must carry the

7 initial burden to establish a prima facie case of racial

8 discrimination. Thereafter, the employer has the burden of proof

9 to articulate a legitimate, nondiscriminatory reason for the

10 challenged action. The plaintiff must then show by a

11 preponderance that the employer's stated reason for the action

12 was in fact mere pretext. <u>McDonnel Douglas Corporation v. Green</u>,

13 411 U.S. 792, 802-806 (1973); <u>Texas Department of Community</u>

14 <u>Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

15     In order to demonstrate a prima facie case, a plaintiff must

16 offer evidence that gives rise to an inference of unlawful

17 discrmination. <u>Burdine</u>, 450 U.S. at 253-54. A plaintiff may

18 accomplish this by introducing direct evidence of discriminatory

19 intent, by introducing evidence that suggests that the employment

20 decision was based on an illegal discriminatory criterion, or by

21 using factors such as those set forth in <u>McDonnell Douglas</u> at 802

22 (there, showing membership in a protected class, qualification

23 for a position, rejections despite qualifications, and the

24 employer's continuing to seek applicants). <u>Cordova v. State Farm</u>

25 <u>Ins. Companies</u>, 124 F.3d 1145, 1148-49 (9th Cir. 1997).

26     Because the ultimate burden of persuading the trier of fact

27 that the defendant intentionally discriminated against the

28 plaintiff remains at all times with the plaintiff, the burden of

35

1  persuasion never shifts; rather, a defendant's burden is to rebut
2  the presumption of discrimination by producing evidence that the
3  reason for the challenged action was legitimate and
4  nondiscriminatory. The defendant need not persuade the Court that
5  it was actually motivated by the proffered reasons; it is
6  sufficient that the defendant's evidence raises a genuine issue
7  of fact as to whether it discriminated against the plaintiff.
8  Burdine, 450 U.S. at 254-55. This requirement is met if the
9  defendant clearly sets forth through admissible evidence the
10 reasons for the challenged action that are legally sufficient to
11 justify a judgment for the defendant. Id. at 255. Once this
12 burden of production is met, the presumption raised by the prima
13 facie case is rebutted, and it disappears. Id.

14       The plaintiff's burden at this point is persuade the Court
15 that the plaintiff has been the victim of intentional
16 discrimination, which may be accomplished either 1) by directly
17 persuading the Court that a discriminatory reason more likely
18 motivated the employer, or 2) indirectly by showing that the
19 employer's proffered explanation is unworthy of credence.
20 Burdine, 450 U.S. at 256.

21                    1. Prima Facie Case

22       Direct evidence is evidence which, if believed, proves the
23 fact (here, discrminatory animus) without inference or
24 presumption. Aragon v. Republic Silver State Disposal, Inc., 292
25 F.3d 654, 662 (9th Cir. 2002). Direct evidence must be more than
26 "stray remarks" and must constitute strong evidence of
27 discriminatory animus. Cordova v. State Farm Ins. Companies, 124
28 F.3d at 1149. In Cordova, the plaintiff offered evidence that the

decisionmaker had stated that another worker of Plaintiff's ancestry was a "dumb Mexican" and was hired because he was a member of a minority. Id. The court concluded that this was evidence that suggested that the employment decision was based on an illegal, discriminatory criterion. Id. Further, the court distinguished such remarks from stray remarks that have been held insufficient to establish discrimination, such as remarks from a supervisor that they did not necessarily like grey hair, which were not tied directly to an employee's termination and which were uttered in an ambivalent manner, or a statement by a hiring executive that he chose a bright, intelligent, knowledgeable young man over the litigant. Id. The court noted that the "dumb Mexican" remark was a bigoted, egregious insult that was sufficiently probative despite its having referred to someone other than the plaintiff and its having been stated after the challenged employment action occurred. This was because the person making the remark was the decisionmaker and because the remark was sufficiently strong that it likely would have affected his decision about the litigant. Id.

Here, Plaintiff has produced no direct evidence that Prich's motivation in discharging Plaintiff was because of Plaintiff's national origin. Prich hired Plaintiff. Plaintiff testified at deposition that Prich was kind to him and treated him well until "near the end," (Dep. at 28), and he produced no evidence of any statement by Prich that would establish discriminatory animus.

With respect to indirect evidence of discriminatory intent, in a case involving allegations of wrongful termination, a prima facie case under the McDonnell Douglas factors may be made out by

37

establishing that 1) Plaintiff was a member of a protected class;
2) he was qualified for the position; 3) he was discharged; and
4) the position remained open and was ultimately filled by a
person not a member of the protected class. St. Mary's Honor
Center v. Hicks, 509 U.S. 502, 506 (1993).

Here, it is undisputed that Plaintiff belonged to a
protected class and was discharged.

It is undisputed that the first welder hired by Prich after
Plaintiff's termination was Rolando Cardinas, who is Hispanic.
(Prich Decl. at 10.) It is not clear if Cardinas was of Mexican
origin. Plaintiff has not provided any evidence that Cardinas was
not of Mexican origin.

With respect to Plaintiff's being qualified for his
position, if one disregards the conflicting evidence and accepts
all of Plaintiff's evidence regarding his disciplinary history,
it could be inferred that aside from Plaintiff's admitted
absenteeism and the flag violation, he was qualified for the job.
Plaintiff testified that Jose Garcia, and not Plaintiff, was the
one who failed properly to gauge the hoses in November 2001 (Dep.
at 48-49); another worker (Plaintiff could not recall who it was)
was responsible for the failure to install the stop on the car in
May 2002 (Dep. at 58-59); Plaintiff claimed that his failure to
mark a coupler was the responsibility of Kevin, who neglected to
instruct Plaintiff how to mark it (Dept. at 59-62, 65), and not
Plaintiff; and Plaintiff testified that he worked faster than the
other workers and was given less time within which to complete
tasks (Dep. at 50-51, 62-65, 68-69).

As to absenteeism, Plaintiff admitted that he had been

38

absent and had been warned about absenteeism, but he had improved
his attendance and had not been tardy again. (Dep. at 49.)
However, he did not produce any evidence that he had a doctor's
excuse, as required by company policy, for his absence on
February 21, 2003; and he did not produce evidence that he called
before ten minutes before he was due to work. (Dep. at 74-75.)
Further, with respect to the blue flag incident, Plaintiff
admitted that it was a safety violation and that he made a
mistake by not putting a blue box to cover the lock; however, he
stated that the flag was up. (Dept. at 72-73.)

     Giving Plaintiff the benefit of the doubt, and in the
absence of evidence that absenteeism and a blue flag violation
alone would constitute grounds for Prich's discharge of
Plaintiff, it will be inferred that Plaintiff was qualified for
the job.

     Thus, even indulging all inferences in favor of Plaintiff,
who is resisting Defendant's motion for summary judgment, and
disregarding the conflicting evidence, it may be concluded that
Plaintiff did not meet his burden of establishing the McDonnell
Douglas factors because he failed to show that the person who was
hired for his position was not of Mexican origin. Otherwise,
Plaintiff has met his burden of establishing a prima facie case
of discriminatory animus.

     Looking to other indirect evidence of discriminatory
evidence, the Court finds insufficient directly to establish
animus Plaintiff's testimony that Mitchell Elliott, his lead man,
once commented to Everett Keller in the presence of Plaintiff and
Jose Garcia while on the job that when Elliott was in high

1  school, he had always had problems with Mexican people. (Dep. at
2  30.) This remark was not by the decisionmaker, it was not
3  focused, it was not stated in anger, it did not relate to the
4  discharge of Plaintiff, and it was in the form of a statement of
5  experience as distinct from an epithet or insulting remark.

6       Similarly, the Court finds insufficient directly to
7  establish animus Elliott's stating to Plaintiff, "Jose, what, you
8  don't know--you don't know English?" (Dep. at 32-33.) The time or
9  context of the remark is not clear. Because it happened at a
10 place of work and involved interaction between a lead man and a
11 worker, this remark is as reasonably interpreted as an indication
12 of frustration over communication or Plaintiff's performance of
13 the job as it is an indication of animus towards a group that
14 speaks another language. It simply does not rise to the level of
15 a remark that directly shows that Prich had discriminatory animus
16 when he discharged Plaintiff. Even less probative would be
17 Elliott's telling Plaintiff, especially when he was working with
18 Jose Garcia, "Why don't you guys finish this?" (Dept. 33-34.)

19      Plaintiff's testimony that Jose Garcia used to tell him that
20 they sometimes treated him badly, would yell at him, and treat
21 him differently from Caucasians (Dep. at 34-35) is also not
22 particularly probative. It is in the nature of hearsay. The
23 subjects of the remarks and the articulation of them were not
24 matters within the scope of Garcia's employment; Garcia has not
25 been shown to have played any part in the decision to discharge
26 Plaintiff. The statements are bereft of detail or context, and
27 they are entirely uncorroborated. See Williams v. Pharmacia,
28 Inc., 137 F.3d 944, 949-51 (7th Cir. 1998); see also Hester v.

1  BIC Corp., 225 F.3d 178, 185 (2nd Cir. 2000).

2       With the exception of the matters covered above, Plaintiff
3  testified that he did not hear anyone at Defendant's operation
4  use racial slurs. (Dep. at 34, 37-78.)

5       Plaintiff's feeling that because of Elliott's two remarks,
6  Elliott would treat Mexican workers differently is likewise not
7  direct evidence of discriminatory animus in the decision to
8  discharge Plaintiff.

9       In addition to evidence of Elliott's remarks, it is
10 undisputed that Prich gave Plaintiff no reason for his
11 termination. In light of this and Plaintiff's evidence that he
12 was talked to and reminded to work and not talk in a manner and
13 frequency not applied to Caucasian workers, a very weak inference
14 of discriminatory intent might arise.

15      In an abundance of caution, and considering the low level of
16 proof required for a plaintiff to establish a prima facie case,
17 the Court will continue with the analysis.

18                    2. Legitimate Business Reasons

19      If it were assumed that Plaintiff had made a prima facie
20 case and that a bare presumption of discriminatory animus had
21 been made out, then the Court concludes that Defendant has
22 established a legitimate, nondiscriminatory reason for
23 terminating Plaintiff.

24      The declaration of plant manager Prich, the person who hired
25 Plaintiff and who solely had the authority to discharge
26 Plaintiff, establishes that he suspended and then terminated
27 Plaintiff for deficiencies in work performance, including
28 absenteeism, repeated safety violations, inefficient performance

                              41

of his work, and, upon Plaintiff's return, further absenteeism
and insubordination.

Employee misconduct, insubordination, and poor work
performance are clear, legitimate, and nondiscriminatory reasons
for terminating an employee. Aragon v. Republic Silver State
Disposal, Inc., 292 F.3d 654, 660-61 (9th Cir. 2002). The
employer's burden is minimal, amounting only to an obligation to
explain what was done or merely produce evidence of legitimate,
nondiscrimintory reasons. Board of Trustees of Keene State
College v. Sweeney, 439 U.S. 24, 25 n. 2 (1978). Here,
Defendant's evidence is sufficient to establish, even by a
preponderance of the evidence, that Prich decided to terminate
Plaintiff for these reasons without input from Elliott, and Prich
would have terminated any employee for such reasons regardless of
the employee's national origin. Plaintiff had garnered numerous,
serious disciplinary actions in his twenty months of employment
which had not been corrected despite repeated warnings and
suspensions.

3. Pretext

Because the employer met its burden of establishing
nondiscriminatory reasons for the termination, any presumption of
discriminatory intent that might have arisen from Plaintiff's
demonstrating a prima facie case was dispelled. See Burdine, 450
U.S. at 255-56. Plaintiff must produce evidence that is specific,
substantial, and sufficient to demonstrate that Defendant's
reasons were really a pretext for racial discrimination. Aragon
v. Republic Silver State Disposal, Inc., 292 F.3d at 661.
Plaintiff must do more than merely establish a prima facie case

and deny the credibility of Defendant's witnesses. <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270 (9th Cir. 1996). Further, an employee's subjective personal judgment of his competence alone does not raise a genuine issue of material fact. <u>Id.</u>

Plaintiff has produced no specific, substantial evidence that Defendant's reasons were pretextual. Plaintiff asserted at deposition that the reason must have been discrimination on the basis of his national origin because Prich gave him no reason for his termination and stated that he did not have to give him a reason. The fact that Prich gave him no reason for termination was adequately explained by Prich's explanation in his declaration (at 9) that he was flabbergasted and upset because when he asked Plaintiff why it had taken him so long to do the job on February 8, Plaintiff responded that if he made more money he could get his work done faster. Plaintiff essentially admitted that this was his response. (Dep. at 76-77.) Further, Plaintiff admitted that he did not know the real reason he was terminated. (Dep. at 78.)

Plaintiff's evidence to the effect that he was unfairly or incorrectly disciplined in several instances does not suffice to raise an issue of material fact as to the true motivation for his discharge. All of Plaintiff's claims were disputed by specific evidence from Elliott and Prich.[4] Further, Plaintiff's evidence

---

[4] Further, with respect to Elliott, who was not shown to have participated in the decision to discharge Plaintiff, but who was Plaintiff's lead, the declaration of Elliott establishes that he did not participate in the decisions to discipline Plaintiff about the hose gauging, blue flag violation, or inefficient performance at the time of his suspension. Elliott adopted his brother's two Hispanic children, who are presently six and eight years old, at birth, and Elliott's son-in-law is half Hispanic.

was general and would go merely to the credibility of Elliott.
Plaintiff also lacked contextual information, such as whether or
not the co-workers, who Plaintiff claimed after the fact were
responsible, were themselves disciplined for the incidents.
Plaintiff admitted that the hose was incorrectly gauged; although
he stated that Jose was the one who actually incorrectly gauged
the hoses, he would not say that it was Jose's fault, and he
produced no evidence that he complained of incorrect or unfair
discipline with respect to the gauging. (Dep. at 47-49.) With
respect to the failure to put a stop on the sliding door,
Plaintiff claimed that it was another worker who failed to follow
Plaintiff's instruction to put on the stop, but he could not
remember who it was; further, he admitted that he did not tell
Prich or Elliott that discipline for it was unfair. (Dep. at 58-
59.) Plaintiff's testimony that Elliott was looking for reasons
to write him up (Dep. at 50) was very general, and it had no
effect beyond creating a weak inference going only to the
credibility of Elliott, who was not involved in several of the
disciplinary incidents, and who did not terminate Plaintiff. With
respect to the unmarked coupler, Plaintiff claimed that his
failure to mark it was not his fault, but he never later brought
the discipline up to Prich or David Petty. (Dep. at 59-62, 65.)
His denial of his inefficient, slow work habits was very general
and lacked specificity and substantiality. Plaintiff admitted his
absenteeism and failure fully to comply with the blue flag safety
protocol.

Plaintiff produced no evidence sufficient to raise an issue
of material fact that Prich himself had discriminatory animus

when he fired Plaintiff. Further, where the same person hired and fired the plaintiff within a short period of time, a strong inference arises the there was no discriminatory motive. <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270 (9th Cir. 1996). Here, Prich hired and fired Plaintiff within a relatively short period (twenty months). Further, Prich's next hire for a welding position was a Hispanic employee.

Reference to the larger context of the actions undertaken by Defendant likewise produces no basis for an inference that Prich was actually motivated by discriminatory intent; indeed, examination of the context of Defendant's actions only supports the Defendant's case. The declarations of Valerie and Gordon Prich establish that Plaintiff was instructed with respect to the rules or policies that he violated. Prich routinely disciplined employees for the reasons for which Plaintiff was disciplined. Prich on some occasions gave Plaintiff less serious discipline than the rules permitted. Further, the statistical make-up of Defendant's workforce militates against an inference of discrimination: at the pertinent time, thirty-five per cent of Defendant's employees were Hispanic; two of the four assistant leads were Hispanic; of the three employees discharged for insubordination from July 2001 through August 2003, one was Plaintiff, and the other two were Caucasian; half of the employees warned about safety violations since 2001 were Hispanic; six of the thirteen employees warned about poor work performance were Hispanic, and six were Caucasian; and two other employees (one Hispanic, and one Caucasian) were given proportional suspensions for inefficient work performance at the

time of Plaintiff's suspension.

In summary, Plaintiff has failed to present evidence sufficient under the applicable law to raise an issue of fact with respect to Defendant's motivation in terminating Plaintiff. Accordingly, the Court concludes that Plaintiff has failed to demonstrate that Defendant's legitimate business reasons for terminating Plaintiff were pretextual. Because Plaintiff bears the burden of proof as to discriminatory discharge, and because he has failed to submit evidence sufficient to raise an issue of material fact as to whether or not he was discharged because of his national origin, Defendant is entitled to judgment as a matter of law.

VII. <u>Discriminatory Treatment or Harassment</u>

If the Court erred in determining that Plaintiff did not exhaust his claim of discriminatory treatment with respect to being told to continue working or to finish his work, then the Court finds that Plaintiff failed to raise an issue of material fact with respect to this claim.

Initially, the Court must determine what type of claim Plaintiff is asserting. It appears that it could be either a disparate treatment claim or a claim of hostile work environment. The different types of claims have been succinctly described in a case involving Title VII and the Age Discrimination in Employment Act, <u>Sischo-Nownejad v. Merced Community College District</u>, 934 F.2d 1104, 1109 (9th Cir. 1991):

> Title VII of the Civil Rights Act makes it illegal for
> an employer "to discriminate against any individual
> with respect to his compensation, terms, conditions, or
> privileges of employment, because of such individual's
> ... sex." 42 U.S.C. § 2000e-2(a)(1). The Age

46

Discrimination in Employment Act forbids the identical conduct when the discrimination is "because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may show violations of these statutes by proving disparate treatment or disparate impact, or by proving the existence of a hostile work environment. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); Jordan v. Clark, 847 F.2d 1368, 1373 (9th Cir.1988), cert. denied, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989); Equal Employment Opportunity Commission v. Borden's, Inc., 724 F.2d 1390, 1392 (9th Cir.1984). Disparate treatment involves intentional discrimination. Borden's, 724 F.2d at 1392. Disparate impact involves a facially neutral employment criterion that has an unequal effect on members of a protected class; discriminatory intent need not be proved. Id. at 1392- 93. A hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66-67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); Young v. Will County Dep't of Public Aid, 882 F.2d 290, 294 (7th Cir.1989); Jordan, 847 F.2d at 1373.

934 F.2d at 1109.

To establish a claim of disparate treatment under Title VII, a plaintiff must establish a prima facie case sufficient to give rise to an inference of discrimination. The plaintiff must show that 1) he belonged to a protected class; 2) he was performing according to his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) other employees with qualifications similar to his own were treated more favorably. Godwin v. Hunt Wesson, Inc. 150 F.3d 1217, 1220 (9th Cir. 1998) (overruled on other grounds in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)).

Here, it does not appear that Plaintiff has established that he was performing according to his employer's legitimate expectations. Further, it is questionable whether the criticism of which Plaintiff complains constitutes an adverse employment

47

1    action; Plaintiff has not linked the very general conduct to any

2    discipline or other tangible consequences. See Kortan v.

3    California Youth Authority, 217 F.3d 1104, 1113 (9th Cir. 2000).

4          Further, the evidence that would support an inference of a

5    prima facie case if discrimination is extremely general and lacks

6    contextual data, such as the time of the alleged treatment and

7    nature and quantity of work being performed by the various

8    workers. The only evidence Plaintiff has provided to support this

9    claim is his own testimony that he was spoken to about staying on

10   task with a frequency not observed with respect to some Caucasian

11   employees, and a reference to statements made by Garcia to him

12   about Garcia's being treated badly. Plaintiff has not provided

13   evidence that shows the number of times he was subjected to such

14   treatment or the time within which the treatment occurred. He has

15   not provided any specific evidence that any particular employees

16   not of Mexican descent were treated better than he in this

17   respect. He testified that several others, including employee

18   Guintana, were not spoken to about working as he was, but he also

19   testified that he did not know what race Guintana was. (Dep. at

20   86.) He testified that all the other workers were given more

21   time. (Dep. at 64.) The record does not support an inference that

22   all the others were Caucasian or were not of Mexican descent. It

23   is clear that some of the other workers had Hispanic names. (Dep.

24   at 64, 80-81, 86.)

25         In light of the state of the evidence, Plaintiff's general

26   testimony does not warrant an inference of discriminatory

27   treatment. The record also contains the specific evidence of

28   Elliott's declaration, in which Elliott denied treating employees

                                    48

1   differently, and affirmatively stated that Plaintiff's own lack
2   of focus on his tasks warranted his reminders. Further, Gordon
3   Prich's declaration establishes that other employes terminated
4   for poor work performance were Caucasian, and half of the
5   employees discplined for safety violations were Caucasion while
6   half were Hispanic.

7        If Plaintiff's claim is viewed as a harassment or hostile
8   work environment claim, then to prevail on a hostile workplace
9   claim a plaintiff must show: 1) that he was subjected to verbal
10  or physical conduct of a racial or sexual nature; 2) that the
11  conduct was unwelcome; and 3) that the conduct was sufficiently
12  severe or pervasive to alter the conditions of the plaintiff's
13  employment and create an abusive work environment. <u>Vasquez v.</u>
14  <u>County of Los Angeles</u>, 349 F.3d 634, 642 (9th Cir. 2003). To
15  determine whether conduct was sufficiently severe or pervasive to
16  violate Title VII, the Court will consider all the circumstances,
17  including the frequency of the discriminatory conduct; its
18  severity; whether it is physically threatening or humiliating, or
19  a mere offensive utterance; and whether it unreasonably
20  interferes with an employee's work performance. <u>Id.</u> Further,  the
21  employee's work environment must both subjectively and
22  objectively be perceived as abusive. <u>Id.</u>

23       Here, Plaintiff's evidence may warrant an inference, albeit
24  weak, that the type of conduct complained of was of a racial
25  nature or was related to national origin. However, he has not
26  shown that the conduct was necessarily humiliating or offensive
27  or that it unreasonably interfered with his work performance; it
28  is not possible to draw an inference that the conduct was

subjectively and objectively perceived as abusive. The evidence does not warrant an inference that the conduct was severe or pervasive enough to constitute a hostile work environment. Compare Vasquez v. County of Los Angeles, 349 F.3d at 642-44 (claims of continual harassment with specific factual allegations regarding only a few incidents over the course of a year held insufficient to constitute severe, pervasive conduct). There is no basis for an inference that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and to create an abusive work environment. The Court concludes that Plaintiff has not raised an issue of fact as to the presence of severe or pervasive conduct.

Further, Defendant has introduced evidence that it established in January 1999, disseminated, and enforced an anti-harassment policy and complaint procedure of which Plaintiff was aware but which Plaintiff failed to use. (V. Prich Decl. at 2, Ex. D.) Even if it is assumed that an inference of some generalized hostile work environment or harassment by Elliott, unaccompanied by tangible employment action, is warranted by Plaintiff's evidence, and if it is further assumed that it was severe or pervasive, then the Court would consider whether the employer exercised reasonable care to prevent and correct harassing behavior, and whether the employee failed unreasonably to take advantage of any preventive or corrective opportunities provided by the employer, or otherwise to avoid harm. See Burlington Industries, Inc. v Ellerth, 524 U.S. 742, 764-66 (1998) (hostile work environment based on supervisor's repeated

1  sexual harassment); <u>Faragher v. Boca Raton</u>, 524 U.S. 775 (1998)
2  (same).

3       Here, Defendant established by a preponderance of the
4  evidence that it promulgated a harassment prevention policy that
5  the administration manager went over with Plaintiff upon his
6  hiring. Plaintiff signed an acknowledgment of having received a
7  written copy and oral overview of the policy; he stated that he
8  understood that he had to notify either his supervisor or human
9  resources if he was subject to behavior that could be considered
10 harassment, and further that he understood that all reports would
11 be investigated and that by makeng such a report, he would not be
12 subject to retaliation. (V. Prich Decl., Ex. D; see Dep. at 40.)
13 Plaintiff did not present any evidence that would warrant an
14 inference that his failure to complain was reasonable, or that a
15 failure to complain was excused.

16      In summary, the Court concludes that Defendant would be
17 entitled to judgment on this claim, should it have been preserved
18 by exhaustion of administrative remedies.

19      VII. <u>Request for Judicial Notice</u>

20      At the conclusion of its statement of undisputed facts,
21 Defendant requests that the Court take judicial notice of the
22 documents referred to in the motion. The Court has considered the
23 evidentiary documents in connection with the merits of the
24 motion. Further, it has considered the authorities cited by
25 Defendant. Accordingly, Defendant's request for judicial notice
26 is denied.

27      In summary, Plaintiff has failed to raise an issue of
28 material fact with respect to issues on which he would bear the

51

burden of proof. Defendant is entitled to judgment as a matter of law.

Accordingly, it IS ORDERED that

1. Defendant's motion for judicial notice IS DENIED; and

2. Defendant's motion for summary judgment IS GRANTED; and

3. The Clerk IS DIRECTED to enter judgment for Defendant Gunderson Rail service and against Plaintiff Jose L. Vargas.


IT IS SO ORDERED.

**Dated:   May 12, 2005**                    **/s/ Sandra M. Snyder**
icido3                                   UNITED STATES MAGISTRATE JUDGE